1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9      FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   Tuck's Restaurant and Bar, et al.,                    No. 2:20-cv-02256-KJM-CKD

12                  Plaintiffs,                            ORDER

13        v.

14   Gavin Newsom, et al.,

15                  Defendants.

16

17          Two Nevada County restaurants, their owners, and a Nevada County restaurant coalition

18   challenge long-terminated COVID-19-related restrictions imposed by various state officials,

19   members of the Nevada County Board of Supervisors, and several other Nevada County officials.

20   The State and County Defendants[1] have moved separately to dismiss plaintiffs' complaint in its

21   entirety.  As explained below, plaintiffs' claims against the State Defendants are moot, and the

---

[1] State Defendants, all of whom are sued in their official capacities, are Governor Gavin Newsom, California Attorney General Rob Bonta, Secretary of the California Health and Human Services Agency Mark Ghaly, acting Director of the California Department of Public Health Brandon Nunes, and acting State Public Health Officer for the California Department of Public Health Erica Pan.  Compl. ¶¶ 22–27, ECF No. 1.  County Defendants include each member of the Nevada County Board of Supervisors, all of whom plaintiffs sued in their official capacity; Nevada County Public Health Officer Richard O. Johnson, sued in his official capacity; Nevada County Director of Environmental Health Amy Irani, sued in her official and personal capacities; and Nevada County Counsel Katharine Elliott, sued in her official and personal capacities.  *Id.* ¶¶ 28–33.

1

1  State Defendants' motion is thus **granted** in full; the County Defendants' motion to dismiss is

2  **granted in part and denied in part**.

3  **I.      JUDICIAL NOTICE**

4          Defendants request judicial notice of various state and county orders and notices of

5  violation.  *See* St.'s Req. Jud. Not. ("St.'s RJN"), ECF No. 12; Cnty.'s Req. Jud. Not. ("Cnty.'s

6  RJN"), ECF No. 10; St.'s Second Req. Jud. Not. ("St.'s Second RJN"), ECF No. 35.  State

7  Defendants further request judicial notice of state and federal government COVID-19 trackers

8  and publicly reported data.  *See* St.'s RJN Exs. 12–13.  After reviewing each exhibit and

9  considering plaintiffs' limited arguments in opposition, the court finds all exhibits to be matters of

10  public record and proper subjects of judicial notice.  *See* Fed. R. Evid. 201(b).  The court thus

11  takes notice of the exhibits' existence and contents, but not that the claims made within them are

12  true.  *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 n.2 (9th Cir. 2020).

13  **II.     BACKGROUND**

14          At this stage, the court assumes the following allegations are true.  *See Ashcroft v. Iqbal*,

15  556 U.S. 662, 678–79 (2009).

16          **A.      The State's & County's COVID-19 Policies and Their Effects on Plaintiffs**

17          In early 2020, Governor Newsom declared a state of emergency due to the health crisis

18  caused by the spread of SARS-CoV-2, the virus that causes COVID-19.  Compl. ¶ 34, ECF No. 1;

19  St.'s RJN Ex. 1.  At the same time, California's Public Health Officer issued a directive

20  restricting public activities throughout the state.  St.'s RJN Ex. 3.  Governor Newsom then issued

21  an order directing all California residents to heed the State Public Health Officer's directive,

22  excepting those working at jobs deemed "essential."  Compl. ¶ 35; St.'s RJN Ex. 4.  To comply

23  with the Governor's order, plaintiffs were "required to cease providing indoor dining for their

24  customers" but were permitted to "offer exclusively take-out and delivery service."  Compl. ¶ 37.

25  They also were forced to lay off employees and "cancel numerous previously scheduled

26  reservations and events."  *Id.* ¶¶ 41–43.

2

Subsequent government directives created a fluctuating set of requirements for plaintiffs' businesses.  In early May 2020, the State permitted businesses to begin reopening in stages.  *See id.* ¶¶ 45–46; St.'s RJN Ex. 6.  Plaintiffs immediately resumed indoor dining service, although they were "required by defendants to implement numerous additional health and safety practices."  Compl. ¶¶ 47–49.  Roughly two months later, on July 13, 2020, a resurgence of COVID-19 cases led the State to issue "a further Order directing all restaurants . . . to again cease indoor dining service."  *Id.* ¶ 50.  On August 28, 2020, the State Public Health Officer issued a statewide order that superseded previous orders, titled "Blueprint for a Safer Economy"; this order was in effect when plaintiffs filed the present lawsuit.  *Id.* ¶ 52; St.'s RJN Ex. 9.  The Blueprint for a Safer Economy classified counties using color-coded tiers—purple, red, orange, and yellow—to indicate the severity of restrictions applicable.  Compl. ¶¶ 52–53.  Depending on the tier, restaurants were required to (1) "cease all indoor dining (Purple tier)"; (2) "limit indoor dining capacity to 25% (Red tier)"; or (3) "limit indoor dining capacity to 50% (Orange and Yellow tiers)."  *Id.* ¶ 53.  Nevada County also issued orders, generally mirroring the State's restrictions. *See id.* ¶¶ 56–67.  Plaintiffs were subject to red tier restrictions from August 28 through September 21, and subject to the orange and yellow tiers from September 22 until they filed this action on November 11, 2020.  *Id.* ¶ 77.

### B. Nevada County's Enforcement

Plaintiffs offered indoor dining in contravention of the orders summarized above.  *Id.* ¶ 70.  On July 21, 2020, the County served plaintiff-restaurants with orders requiring immediate closure, citing an "imminent and substantial health hazard" and threatening fines for violating the state's restrictions on in-person dining.  *Id.* ¶ 69; Cnty.'s RJN Exs. F–G.  Plaintiffs allege the closure orders were "arbitrary and capricious" because the County Defendants made no "specific finding" of an "imminent and substantial health hazard."  Compl. ¶ 69.  Plaintiffs also allege the County singled them out for enforcement.  Three other restaurants were offering indoor dining but did not receive closure orders.  *Id.* ¶ 70.

Plaintiff-restaurants then organized "the Coalition," a letter-writing group, to oppose the County's shutdown orders.  *Id.* ¶¶ 71–72.  The coalition is also a plaintiff in this case, and

1   plaintiffs allege the Nevada County defendants responded to the coalition's creation by

2   "coerc[ing] plaintiffs to forego their First Amendment rights." *Id.* ¶ 73.  Specifically, plaintiffs

3   allege when they spoke with Nevada County Director of Environmental Health Amy Irani and

4   Nevada County Counsel Katharine Elliott about ways to reopen their restaurants, Ms. Elliott

5   made two statements: (1) as a condition of reinstituting their operating permits and reducing their

6   fines, plaintiffs were to "behave" and stop asking people to write letters to county and local

7   officials, *id.* ¶ 74; and (2) plaintiffs' creation of the coalition was grounds to refuse to negotiate a

8   reduction in fines, *id.* ¶ 75.  Plaintiffs further allege Ms. Elliott's statements were made "on behalf

9   of the Supervisor Defendants and were the official policy of Nevada County." *Id.* ¶ 76.

10      **C.      Procedural History**

11          Plaintiffs' complaint asserts five claims against the State and County Defendants and one

12   claim against only the County Defendants.  Against both sets of defendants, plaintiffs allege

13   violations of their rights under the United States Constitution, including their substantive and

14   procedural due process rights under the Fourteenth Amendment (claims 1–2), *id.* ¶¶ 90–127; their

15   right to equal protection under the Fourteenth Amendment (claim 3), *id.* ¶¶ 128–137; the right to

16   just compensation for their property under the Fifth Amendment (claim 4), *id.* ¶¶ 138–145; and

17   their right to engage in interstate commerce under the Commerce Clause (claim 5), *id.* ¶¶ 146–

18   155.  Plaintiffs seek an order declaring the challenged restrictions unconstitutional and enjoining

19   their enforcement. *Id.* (Prayer for Relief).  Against only the Nevada County Defendants,

20   plaintiffs seek damages for the above-alleged constitutional violations and for violations of their

21   First Amendment rights to free speech, lawful assembly, and petition for redress (claim 6). *Id.*

22   ¶¶ 156–62; *id.* at 33–34 (Prayer for Relief).

23          As noted, the State and County Defendants moved separately to dismiss plaintiffs'

24   complaint in its entirety. *See* St.'s Mot., ECF No. 11; Cnty.'s Mot., ECF No. 9.  The court

25   received full briefing and heard oral arguments by videoconference at a hearing on March 4,

26   2021. *See* Opp'n, ECF No. 16; Opp'n, ECF No. 18; Cnty.'s Reply, ECF No. 21; St.'s Reply,

27   ECF No. 23; Mins., ECF No. 24.  At the court's request, the parties have submitted supplemental

28   briefing addressing whether plaintiffs' requests for declaratory and injunctive relief are now

4

1  moot.  *See* Pl.'s Mootness Br., ECF No. 33; St.'s Mootness Br., ECF No. 34; Cnty.'s Mootness

2  Br., ECF No. 35.

3  **III.   DISCUSSION**

4       Federal courts throughout California and across the country have considered many of the

5  kind of arguments presented here, in cases involving restaurants as well as other business types,

6  and the court has familiarized itself with the jurisprudence that has developed since the onset of

7  COVID-19.  *See, e.g.*, *Brach v. Newsom*, 38 F.4th 6 (9th Cir. 2022) (en banc); *Best Supplement*

8  *Guide, LLC v. Newsom*, No. 20-17362, 2022 WL 2703404 (9th Cir. July 12, 2022) (unpublished);

9  *Pine Valley House Resort, LLC v. Newsom*, No. 21-568, 2022 WL 747729 (S.D. Cal. Mar. 10,

10  2022); *Everest Foods Inc. v. Cuomo*, No. 21-6316, 2022 WL 355553 (S.D.N.Y. Feb. 7, 2022);

11  *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828 (W.D. Tenn. 2020).  The court addresses plaintiffs'

12  requests for declaratory and injunctive relief first, finding them moot as explained below, and

13  then turns to plaintiffs' damages claims.

14       **A.       Plaintiffs' Requests for Injunctive & Declaratory Relief Are Moot**

15       As noted, plaintiffs seek an order from the court declaring various public health orders

16  unconstitutional and enjoining the State and County Defendants from enforcing them.

17  Defendants argue these claims are moot, and the court agrees.  "The basic question in determining

18  mootness is whether there is a present controversy as to which effective relief can be granted."

19  *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 862 (9th Cir. 2017).  All four of the State's orders

20  were rescinded sixteen months ago, *see* St.'s Second RJN Exs. A–C, and the County's order was

21  rescinded twenty-nine months ago, five months before plaintiffs filed this lawsuit, *see* Cnty.'s

22  RJN Ex. C.  And although Governor Newsom has not formally terminated California's state of

23  emergency, it is undisputed that neither the State nor the County has imposed new pandemic-

24  related restrictions affecting plaintiffs.  Plaintiffs' challenges to the State's and County's long-

25  since rescinded COVID-19 safety measures are thus moot.  *Cf. Brach v. Newsom*, 38 F.4th 6, 11

26  (9th Cir. 2022) (en banc) ("[T]here is no longer any state order for the court to declare

27  unconstitutional or to enjoin.  It could not be clearer that this case is moot."); *see Best Supplement*

1   *Guide*, 2022 WL 2703404, at *1[2] ("Because Plaintiffs' request for declaratory and injunctive

2   relief depends on 'the mere possibility that California might again' shut down businesses, all

3   claims against the state defendants are now moot. (quoting *Brach*, 38 F.4th at 9)).[3]

4          Plaintiffs argue their claims are not moot under two exceptions to the mootness doctrine:

5   the voluntary-cessation exception and the capable-of-repetition-yet-evading-review exception.

6   As to the first exception, "[t]he voluntary cessation of challenged conduct does not ordinarily

7   render a case moot because a dismissal for mootness would permit a resumption of the challenged

8   conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S.

9   298, 307 (2012). This doctrine aims to prevent gamesmanship—i.e., to prevent a defendant from

10  engaging in unlawful conduct, stopping when sued in order to have the lawsuit declared moot,

11  and then resuming the conduct. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Courts

12  "presume that a government entity is acting in good faith when it changes its policy, but when the

13  Government asserts mootness based on such a change it still must bear the heavy burden of

14  showing that the challenged conduct cannot reasonably be expected to start up again." *Rosebrock*

15  *v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014); *Bd. of Trs. of Glazing Health & Welfare Tr. v.*

16  *Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (en banc) (courts "treat the voluntary cessation of

17  challenged conduct by government officials with more solicitude . . . than similar action by

18  private parties."). As to the second exception, "[t]he capable of repetition yet evading review

19  exception is limited to extraordinary cases where (1) the duration of the challenged action is too

20  short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the

---

[2] Citation to this unpublished Ninth Circuit opinion is appropriate as provided by Ninth Circuit Rule 36-3(b). *See Animal Legal Def. Fund v. Veneman*, 490 F.3d 725, 733 (9th Cir. 2007) ("[A]s of January 1, 2007, we must now allow parties to cite even unpublished dispositions and unpublished orders as persuasive authority." (citation omitted)); *Nuh Nhuoc Loi v. Scribner*, 671 F. Supp. 2d 1189, 1201 n.10 (S.D. Cal. 2009) (noting "unpublished decisions have persuasive value and indicate how the Ninth Circuit applies binding authority").

[3] Plaintiffs also argue their physical takings claim—alleging defendants "effected a physical taking of the Plaintiffs' designated dining areas"—is not moot because defendants allegedly appropriated plaintiffs' rights to exclude and still retain those rights. Pl.'s Mootness Br. at 4–5, ECF No. 33. This argument requires a physical taking. As discussed below, there was no taking.

1  plaintiffs will be subjected to it again." *Brach*, 38 F.4th at 15 (internal quotation marks and

2  citations omitted).

3        Neither exception applies here, for similar reasons. *See Armster v. U.S. Dist. Ct. for Cent.*

4  *Dist. of Cal.*, 806 F.2d 1347, 1360 n.20 (9th Cir. 1986) (noting voluntary cessation and capable of

5  repetition yet evading review exceptions are "analogous"); *Brach*, 38 F.4th at 15 ("Our rationale

6  for rejecting [the capable of repetition yet evading review] exception mirrors much of our

7  analysis regarding the voluntary cessation exception."). Plaintiffs filed this lawsuit in November

8  2020, when California was still operating under its color-coded tier system and when no

9  authorized vaccines for COVID-19 were available. The orders plaintiffs challenge were a

10  product of these early and uncertain, challenging circumstances. By now, the landscape has

11  significantly changed. Widespread vaccination has significantly reduced risks to the State's

12  healthcare system. *See* Cal. Vaccination Data, https://covid19.ca.gov/vaccination-progress-data/

13  (last visited Sept. 28, 2022). The State has redirected its COVID-19 prevention efforts away from

14  ordering closures and capacity restrictions to increasing vaccination rates, monitoring COVID-19

15  case levels, and stockpiling masks and treatments. *See* Beyond the Blueprint, St.'s Second RJN

16  Ex. C ("fully reopen[ing] the economy"); SMARTER[4] Plan, St.'s Second RJN Ex. E; *id.* at 18

17  (emphasizing goal of "keep[ing] our businesses open").

18        California has not revisited these revised priorities in the months since it rescinded the

19  orders plaintiffs challenge, despite surges in COVID-19 cases and deaths caused by the Delta and

20  Omicron variants.[5] As the Fourth Circuit recently explained in a similar context:

21          If there were any reasonable chance that the Governor might
22          reimpose the safety measures at issue, . . . then those waves of
23          increased infection should have been the occasion for doing so. But
24          they were not, and like other courts, we see that as a powerful signal

---

    [4] SMARTER is an acronym for "Shots, Masks, Awareness, Readiness, Testing, Education, and Rx." St.'s Second RJN Ex. E.

    [5] *See* Tracking COVID-19 in California, *available at* https://covid19.ca.gov/state-dashboard/#county-statewide (showing case rates over time) (last visited Sept. 28, 2022).

that whatever course the COVID-19 pandemic takes, a return to restrictions like those challenged here is highly unlikely.

*Eden, LLC v. Just.*, 36 F.4th 166, 171 (4th Cir. 2022) (internal quotation marks and citations omitted); *accord Brach*, 38 F.4th at 14 ("Tellingly, California maintained in-person instruction throughout the surge of the Omicron COVID-19 variant, even while the State's case count soared well past numbers reached early in the pandemic."). Given the record before the court, there is no reason to anticipate defendants will reinstate the COVID-19 restrictions they have abandoned for some time now.

Plaintiffs' argument to the contrary is unpersuasive. Plaintiffs argue Governor Newsom's "unwillingness to terminate the Emergency Proclamation, more [than] two years after it was instituted, establishes that there is a reasonable expectation that Plaintiffs will again be subjected to the restrictions at issue." Pl.'s Mootness Br. at 9. "[T]he mere power to reenact a challenged policy is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists. Rather, there must be evidence indicating that the challenged [policy] will likely be reenacted." *Brach*, 38 F.4th at 14; *see also Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) (noting fact that "Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot"). The court declines to speculate, as plaintiffs do, that the lack of further closures and capacity restrictions can be chalked up to Governor Newsom's "election posturing."[6] Pl.'s Mootness Br. at 8. Plaintiffs' requests for declaratory and injunctive relief are **moot**, and no exception to mootness applies.

### B.     County Defendants' Motion to Dismiss

Plaintiffs assert six retrospective claims against the County Defendants, which are not moot. Specifically, plaintiffs allege violations of their substantive and procedural due process rights under the Fourteenth Amendment (claims 1–2), Compl. ¶¶ 90–127; their right to equal

---

[6] If, post-election, the State imposes restrictions similar in scope and subject matter to those plaintiffs sought to challenge here, it appears plaintiff could bring a new suit against the State Defendants at that time.

protection under the Fourteenth Amendment (claim 3), *id.* ¶¶ 128–137; the right to just compensation for their property under the Fifth Amendment (claim 4), *id.* ¶¶ 138–145; their right to engage in interstate commerce under the Commerce Clause (claim 5), *id.* ¶¶ 146–155; and their First Amendment rights to free speech, lawful assembly, and petition for redress (claim 6), *id.* ¶¶ 156–162.

The County Defendants move to dismiss each of these claims under Rule 12(b)(6).  A motion under that rule may be granted if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party."  *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible.  *Iqbal*, 556 U.S. at 678.  In the same vein, conclusory or formulaic recitations of elements do not alone suffice.  *Id.* (citing *Twombly*, 550 U.S. at 555).  This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense."  *Id.* at 679.

The court briefly addresses each claim in turn.

### 1.    Substantive Due Process

Plaintiffs allege the County Defendants' orders violated their substantive due process rights by unlawfully infringing "[t]he right of citizens to support themselves by engaging in a chosen lawful occupation or business," *id.* ¶ 92, and "the fundamental liberty interest of citizens to travel, be out and about in public, associate, and simply be left alone while otherwise acting in a lawful manner," *id.* ¶ 93.  Plaintiffs argue these allegations, along with the orders' "nature,

1    scope, duration, and origin," call for heightened scrutiny.  *See* Opp'n at 19.  Defendants disagree,

2    arguing for rational basis review and contending their orders satisfy this deferential standard.  *See*

3    Cnty.'s Mot. at 18–19.

4         Rational basis review is appropriate here.  As the Ninth Circuit recently reiterated in the

5    context of COVID-19 closures and capacity limits, rational basis review is "[t]he proper test for

6    judging the constitutionality of statutes regulating economic activity."  *Slidewaters LLC v.*

7    *Washington State Dep't of Lab. & Indus.*, 4 F.4th 747, 758 (9th Cir. 2021), *cert. denied*, 142 S.

8    Ct. 779 (2022) (quoting *Jackson Water Works, Inc. v. Pub. Util. Comm'n of Cal.*, 793 F.2d 1090,

9    1093–94 (9th Cir. 1986)).  Even if the restrictions were broad, long-lived, dynamic, and imposed

10   by the executive rather than legislative branch, they regulated economic activity.  *See* Opp'n at

11   19–21.  For that reason, rational basis review applies.[7]

12        Under this deferential standard of review, governmental restrictions are "presumed valid"

13   and are sustained if they are "rationally related to a legitimate state interest."  *City of Cleburne,*

14   *Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  "There is a legitimate state interest in

15   preventing the spread of COVID-19, a deadly contagious disease."  *Slidewaters*, 4 F.4th at 758;

16   *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of

17   COVID-19 is unquestionably a compelling interest[.]").  The question, then, is whether the

18   County's orders are rationally related to this interest.

19        In maintaining the orders are not rationally related to the State's interest in preventing the

20   spread of COVID-19, plaintiffs make two primary arguments.  The court finds neither persuasive.

21   First, plaintiffs argue the orders purport to serve public health but are projected to have negative

22   long-term effects on select health indicators such as child vaccination rates and cancer screenings.

23   *See* Opp'n at 22; *see also* Compl. ¶ 110 (quoting at length from "a statement authored by three

24   respected epidemiologists" about the negative public health effects of stay-at-home orders).  This

25   argument does not address whether the County's orders are rationally related to curbing the

----

[7] In opposing County Defendants' motion to dismiss, plaintiffs also argue the orders infringe their rights to interstate and intrastate travel.  *See* Opp'n at 18–19.  But plaintiffs point to no allegation in their complaint grounding this argument, and the court can find none.

1   spread of COVID-19; rather it reflects a policy disagreement.  The kind of cost-benefit analyses

2   plaintiffs advance are best evaluated by politically accountable officials, not the courts.  *See*

3   *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (noting "the general principle that

4   courts will not second-guess the public health and safety decisions of state legislatures acting

5   within their traditional police powers"); *see also Roman Catholic Diocese*, 141 S. Ct. at 74

6   (Kavanaugh, J., concurring) ("Federal courts . . . must afford substantial deference to state and

7   local authorities about how best to balance competing policy considerations during the

8   pandemic."); *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232 n.3 (9th Cir. 2020)

9   (agreeing with the Supreme Court "in saying that members of our court 'are not public health

10  experts, and we should respect the judgment of those with special expertise and responsibility in

11  this area'" (quoting *Roman Catholic*, 141 S. Ct. at 68)).

12          Second, plaintiffs argue the complaint's "well-pleaded allegations" support the conclusion

13  that the orders and restrictions are "patently irrational" because they "employ arbitrary

14  classifications based in some cases on political considerations."  Opp'n at 23 (citing "p. 7, infra,"

15  which contains no discussion of classifications or political considerations).  But in *Slidewaters*, as

16  here, government officials created a health and safety plan that "attempt[ed] to differentiate

17  activities based on how essential they are."  4 F.4th at 758.  "The plan also group[ed] different

18  types of activities and treat[ed] them by category rather than requiring the state to conduct an

19  assessment of each and every individual business or property."  *Id.*  The Ninth Circuit found "it

20  [wa]s not irrational for Defendants to take this approach."  *Id.*; *see also id.* at 758–59 ("The state

21  is not required to draw a perfect line in determining which individual businesses can safely open

22  and which cannot." (citing *Vance v. Bradley*, 440 U.S. 93, 108–09 (1979)).

23          Ultimately, it does not matter whether the defendants' actions "actually advance[d] their]

24  stated purposes," *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004) (citation omitted), or

25  whether plaintiffs "agree with the regulation[s] or [their] application," *Slidewaters*, 4 F.4th at 759.

26  The orders are rationally related to a legitimate government interest, and plaintiffs' substantive

27  due process claim is **dismissed without leave to amend**.  *Cf. Best Supplement Guide*, 2022 WL

28  2703404, at *2 (applying rational basis review to COVID-19 restrictions because plaintiffs did

1    not allege violation of a fundamental interest; affirming dismissal of substantive due process

2    claim because plaintiffs did not allege facts showing restrictions were "clearly arbitrary and

3    unreasonable, having no substantial relation to the public health, safety, morals or general

4    welfare." (quoting *Slidewaters*, 4 F.4th at 758)).

5                            **2.      Procedural Due Process**

6              Plaintiffs allege the public health orders they challenge deprived them of due process

7    because they were issued without "an opportunity for plaintiffs and other members of the public

8    to contest or challenge the resulting limitations on their fundamental rights."  Compl. ¶ 123.  In

9    moving to dismiss, County Defendants assert this argument only reaches the State Defendants,

10   Cnty.'s Mot. at 20, and plaintiffs appear to concede this point, *see generally* Opp'n to Cnty.'s

11   Mot. (omitting discussion of procedural due process claim).  The court need not rely on plaintiffs'

12   concession, however, because "governmental decisions which affect large areas and are not

13   directed at one or a few individuals do not give rise to the constitutional procedural due process

14   requirements of individual notice and hearing; general notice as provided by law is sufficient."

15   *Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1260–61 (9th Cir. 1994) (citations omitted).  For this

16   reason, numerous district courts in this circuit have found that COVID-19 restrictions have

17   required no pre-deprivation process.  *See, e.g.*, *Pine Valley House Resort, LLC v. Newsom*, No.

18   21-568, 2022 WL 747729, at *10 (S.D. Cal. Mar. 10, 2022); *Metroflex Oceanside LLC v.*

19   *Newsom*, 532 F. Supp. 3d 976, 983 (S.D. Cal. 2021); *Culinary Studios, Inc. v. Newsom*, 517 F.

20   Supp. 3d 1042, 1067 (E.D. Cal. 2021) (collecting cases); *Xponential Fitness v. Arizona*, No. 20-

21   1310, 2020 WL 3971908, at *5 (D. Ariz. July 14, 2020) (collecting cases).  This court agrees and

22   dismisses plaintiffs' claim for violation of their procedural due process rights.  Because leave to

23   amend would be futile, this claim is **dismissed without leave to amend**.

24                            **3.      Equal Protection**

25             "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

26   deny to any person within its jurisdiction the equal protection of the laws, which is essentially a

27   direction that all persons similarly situated should be treated alike."  *Serrano v. Francis*, 345 F.3d

28   1071, 1081 (9th Cir. 2003) (internal quotation marks and citation omitted).  Plaintiffs allege the

1   County Defendants violated their rights to equal protection both by issuing the County-wide

2   orders and by serving the closure orders on plaintiff-restaurants.  The court addresses each

3   allegation in turn.

4                              a)      Issuance of County-Wide Orders

5        Plaintiffs argue in one sentence that intermediate scrutiny applies to issuance of the

6   County-wide orders.  *See* Opp'n at 24 ("Plaintiffs submit that [the] Orders at issue should be

7   subjected to intermediate scrutiny on the basis of considerations as substantial as those relied on

8   in *Plyler* [*v. Doe*, 457 U.S. 202 (1982)].").  The Ninth Circuit has described the circumstances in

9   which intermediate scrutiny applies as follows:

10          The Supreme Court has applied an intermediate scrutiny—
11          determining whether the classification is substantially related to an
12          important government interest—to certain disadvantaged classes that
13          were not suspect classes and to important rights that were not
14          fundamental rights.  *See Plyler*, 457 U.S. at 223–24, 102 S.Ct. at
15          2397–98 (reviewing a burden on the right to public education for
16          illegal immigrant minors); *Mississippi Univ. for Women v. Hogan*,
17          458 U.S. 718, 724 (1982) (reviewing a gender classification); *Lalli*
18          *v. Lalli*, 439 U.S. 259, 265 (1978) (reviewing classification based on
19          illegitimacy of children).

20   *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 946 (9th Cir. 1997).  Plaintiffs do not allege

21   or argue non-essential businesses are a disadvantaged class.  And the court rejects plaintiffs'

22   analogy to *Plyler*, which involved a Texas law that denied a public education to undocumented

23   children.  In deciding to apply a heightened standard of review, the Supreme Court emphasized

24   the innocence of the affected children and education's vital role in preserving American

25   democracy.  *See Plyler*, 457 U.S. at 223–24 ("In determining the rationality of [the Texas law],

26   we may appropriately take into account its costs to the Nation and to the innocent children who

27   are its victims.  In light of these countervailing costs, the discrimination contained in [the Texas

28   law] can hardly be considered rational unless it furthers some substantial goal of the State.").

29        Rational basis review applies here.  Under rational basis review, "a state actor's

30   classification comports with the Equal Protection Clause so long as it is 'rationally related to a

31   legitimate state interest.'"  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588–89 (9th Cir. 2008)

13

1  (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988)).  Under this deferential standard, "a

2  'State may not rely on a classification whose relationship to an asserted goal is so attenuated as to

3  render the distinction arbitrary or irrational.'"  *Id.* at 589 (quoting *City of Cleburne*, 473 U.S. at

4  446).  "[R]ational-basis review in equal protection analysis is not a license for courts to judge the

5  wisdom, fairness, or logic of legislative choices."  *Heller v. Doe by Doe*, 509 U.S. 312, 319

6  (1993) (internal quotation marks and citation omitted).  Accordingly, regulations "must be upheld

7  against [an] equal protection challenge if there is any reasonably conceivable state of facts that

8  could provide a rational basis for the classification."  *Id.* at 320.  The "burden is on [plaintiffs] to

9  negat[e] every conceivable basis which might support [the classification]."  *Id.* (quotation

10 omitted).

11        Plaintiffs do not and cannot carry this heavy burden.  As a sister court has persuasively

12 explained in approving executive orders that distinguish essential and non-essential businesses,

13 "[i]ndoor dining involves unique circumstances likely to facilitate COVID-19 transmission.

14 Patrons must remove their masks to eat, increasing[] the likelihood of transmission between

15 individuals.  Restaurants also bring together individuals from different households, facilitating

16 communal spread.  Treating restaurants differently—and indoor dining specifically—logically

17 follows."  *Everest Foods*, 2022 WL 355553 at *6.  Generalizing beyond indoor dining, any

18 number of differences among businesses might bear on the State's assessment of risks and

19 benefits of operating during a viral pandemic, and by extension on the government's policy to

20 classify businesses as essential or non-essential.  Thus, given the deferential standard applicable

21 here, it is no surprise that, as far as this court is aware, "every court considering Equal Protection

22 challenges brought by business owners to COVID-related restrictions has upheld the restrictions,"

23 in addressing motions to dismiss or a request for temporary injunctive relief.  *Metroflex*

24 *Oceanside*, 532 F. Supp. 3d at 981 (quoting *Tandon v. Newsom*, 517 F. Supp. 3d 922, 953 (N.D.

25 Cal. Feb. 5, 2021)); *see also, e.g.*, *Pine Valley House Resort*, 2022 WL 747729 at *10; *Culinary*

26 *Studios*, 517 F. Supp. 3d at 1072 (quoting *Prof'l Beauty Fed'n of Cal. v. Newsom*, No. 20-4275,

27 2020 WL 3056126, at *7 (C.D. Cal. June 8, 2020)); *Six v. Newsom*, 462 F. Supp. 3d 1060, 1072

1   (C.D. Cal. 2020).  This court reaches the same conclusion with respect to plaintiffs' claims

2   challenging County-wide orders.

3                              b)      Serving Closure Orders on Plaintiff-Restaurants

4         Plaintiffs allege the County Defendants violated the Equal Protection Clause by subjecting

5   plaintiff-restaurants "to differential enforcement of public health measures without any rational

6   basis." Compl. ¶¶ 70, 133.  Specifically, plaintiffs allege plaintiff-restaurants were directed to

7   close for violating the State's July 13, 2020 Public Health order, while three other restaurants that

8   maintained similar operations were not.  *Id.* ¶ 70.

9         Both sides agree this is a "class of one" claim, *see* Cnty.'s Mot. at 20–22; Opp'n at 25;

10  Cnty.'s Reply at 18, which is an equal protection claim premised on alleged unique treatment

11  rather than on a classification such as race or sex, *see Vill. of Willowbrook v. Olech,* 528 U.S. 562,

12  564 (2000) (per curiam).  "In order to claim a violation of equal protection in a class of one case,

13  the plaintiff must establish that [defendant] intentionally, and without rational basis, treated the

14  plaintiff differently from others similarly situated."  *N. Pacifica LLC v. City of Pacifica*, 526 F.3d

15  478, 486 (9th Cir. 2008) (citations omitted); *see also id.* ("A class of one plaintiff must show that

16  the discriminatory treatment was intentionally directed just at him . . . ." (internal quotation marks

17  omitted)).  Here, plaintiffs merely allege selective enforcement.  *See* Compl. ¶¶ 68–70.  Their

18  equal protection claim fails for that reason.  *See Freeman v. City of Santa Ana*, 68 F.3d 1180,

19  1188 (9th Cir. 1995) ("Selective enforcement of valid laws, without more, does not make the

20  defendants' action irrational.").

21        Plaintiffs argue to the contrary that "[t]he required element of impermissible motive is

22  pleaded by virtue of the well-pleaded allegations that the County Defendants retaliated against

23  these plaintiffs for their exercise of their First Amendment rights in the enforcement of the

24  closure Orders."  Opp'n at 25.  The court understands this argument to mean one of two things.

25        First, plaintiffs might mean the County's reaction to their First Amendment activity

26  impermissibly motivated service of the closure orders.  But plaintiffs allege the plaintiff-

27  restaurants received the closure orders before they exercised their First Amendment rights.  *See*

28  Compl. ¶¶ 71–72; *see also* Opp'n at 18 ("Friar Tuck's and Old Town Café were ordered closed

15

1     by the County Defendants on July 21, 2020.  *Thereafter*, Friar Tuck's and Old Town Café

2     exercised their Constitutional rights to free speech and association to oppose the measures at issue

3     in this action." (citations omitted and emphasis added)).  The exercise of those rights therefore

4     cannot have provided the prohibited motivation for serving the closure orders in the first place.

5           Second, plaintiffs might mean the County declined to rescind the closure orders because

6     of plaintiffs' First Amendment activity.  But plaintiffs point to no similarly situated business that

7     received closure orders that then went unenforced or were rescinded.  The court cannot exclude

8     the possiblity that plaintiffs could identify similarly situated businesses in an amended complaint.

9     Accordingly, the court grants defendants' motion as to this claim and **dismisses with leave to**

10    **amend** plaintiffs' third claim based on the Equal Protection Clause.

11                    **4.      Uncompensated Takings of Property**

12          Plaintiffs also allege the County orders have caused "a regulatory and physical taking of

13    plaintiffs' property without just compensation."  Compl. ¶ 141.  A physical taking occurs when

14    "the government has physically taken property for itself or someone else—by whatever means[.]"

15    *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  "Regulatory taking," on the other

16    hand, is the somewhat misleading label for "use restrictions that go too far."  *Id.* (citations and

17    quotation marks omitted).  As the Supreme Court recently clarified, the essential distinction

18    between these two categories is not "whether the government action at issue comes garbed as a

19    regulation (or statute, or ordinance, or miscellaneous decree).  It is whether the government has

20    physically taken property for itself or someone else—by whatever means—or has instead

21    restricted a property owner's ability to use his own property."  *Id.*  The court addresses each

22    category of taking in turn.

23                    a)      Physical Takings

24          The Supreme Court recently revisited physical takings in the landmark case *Cedar Point*

25    *Nursery v. Hassid*, 141 S. Ct. 2063 (2021).  There, a California regulation granted union

26    organizers access to agricultural employer property for three hours per day, 120 days per year.  *Id.*

27    at 2069.  The Supreme Court held this regulation effected a physical taking because "the

28    regulation appropriates for the enjoyment of third parties the owners' right to exclude."  *Id.* at

16

1  2072.  In arriving at this conclusion, the Court surveyed the history of the right to exclude,

2  emphasizing it is "one of the most treasured rights of property ownership" and "one of the most

3  essential sticks in the bundle of rights that are commonly characterized as property."  *Id.* at 2072–

4  74 (internal quotation marks and citations omitted).  Even so, the Court limited its holding to

5  property that, like Cedar Point Nursery, is closed to the public.  *See id.* at 2077 (distinguishing

6  *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83 (1980) and explaining "[l]imitations on

7  how a business generally open to the public may treat individuals on the premises are readily

8  distinguishable from regulations granting a right to invade property closed to the public.").

9          Relying on *Cedar Point*, plaintiffs argue the County orders constitute a physical taking.

10  First, plaintiffs contend their right to invite customers into indoor dining areas comprises part of

11  their right to exclude.  *See* Pl.'s Mootness Br. at 3 ("The prohibition of entry onto one's property,

12  and the invitation to enter onto one's property, are two aspects of the same property interest—the

13  right to exclude.").  Second, plaintiffs argue the government's appropriation of that right

14  constitutes a physical taking.  *See id.* at 5.  ("[T]he statutes and regulations take a discrete

15  property interest for the benefit of the government, namely, the Plaintiffs' right to invite their

16  customers into the designated indoor dining areas of their respective private properties, and gives

17  that right to the Defendants[.]").

18          The court is not persuaded.  First, the two cases plaintiffs cite do not support their

19  assertion that the right to invite constitutes part of the right to exclude.  *See* Pl.'s Br. at 3 (citing *In*

20  *re Jason Allen D.*, 127 Md. App. 456, 480 (1999) for an argument made by the prosecution and

21  explicitly rejected by the court, and *Rowland v. Christian*, 69 Cal. 2d 108, 113–14 (1968) for the

22  definitions of "trespasser," licensee," and "invitee").  In the absence of supporting authority, the

23  court sees no reason to construe the right to exclude as broadly as plaintiffs request.  *Cf. U. S.*

24  *Dep't of Agric. v. Moreno*, 413 U.S. 528, 543 (1973) (Douglas, J., concurring) (characterizing

25  "right to invite the stranger into one's home" as an instantiation of the right of association); *see*

26  *Cedar Point*, 141 S. Ct. at 2072–74 (tracing history of right to exclude and equating deprivation

27  of right with physical invasion of property).

1    Second, even if the orders limited plaintiffs' right to exclude, they did not constitute a

2 taking.  That the Court found the government "took" property by forcing its owners to host

3 unwanted third parties in *Cedar Point* does not mean public health capacity restrictions effect a

4 taking.  Moreover, as privately-owned property open to the public, plaintiff-restaurants closely

5 resemble the shopping center in *PruneYard*.  In that case, the Court found no taking when a

6 California constitutional provision prevented the shopping center from excluding students who

7 were distributing pamphlets and collecting signatures.  447 U.S. at 88; *see also Heart of Atlanta*

8 *Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964) (finding anti-discrimination provisions in

9 Civil Rights Act of 1964 did not effect a taking) (cited in *Cedar Point*, 141 S. Ct. at 2076).

10 *PruneYard*'s continued salience is a second, independently sufficient reason the orders challenged

11 in this case did not effect a physical taking.[8]

12                     b)     Regulatory Takings

13    To determine whether the County's orders constitute a regulatory taking or a use

14 restriction that goes too far, the court considers the three factors announced in *Penn Central*:

15 "(1) '[t]he economic impact of the regulation on the claimant,' (2) 'the extent to which the

16 regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of

17 the governmental action.'"  *Bridge Aina Le'a*, 950 F.3d at 625 (quoting *Penn Cent. Transp. Co. v.*

18 *City of New York*, 438 U.S. 104, 124 (1978)) (alterations in original).  This test is exacting; the

19 *Penn Central* factors seek "to identify regulatory actions that are functionally equivalent to the

20 classic taking in which government directly appropriates private property or ousts the owner from

21 his domain."  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005).

22 /////

---

[8] The court need not attempt to reconcile *Cedar Point* with *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).  No *Lucas* taking is alleged here because plaintiffs do not allege they were completely deprived of all economically beneficial use of their property.  *See Bridge Aina Le'a, LLC*, 950 F.3d at 626 (*Lucas* taking occurs when regulations "completely deprive an owner of all economically beneficial use of her property." (internal citations, alterations, and quotation marks omitted)); Compl. ¶ 37 ("Plaintiffs were permitted to offer exclusively take-out and delivery service.").

Here, taking these factors in reverse, the third strongly suggests plaintiffs have not alleged a taking.  *Penn Central* itself identified "a public program that adjusts the benefits and burdens of economic life to promote the common good" as uncharacteristic of a regulatory taking.  438 U.S. at 124.  The County's orders created this type of public program.  *See generally* St.'s RJN & Cnty.'s RJN.  This court joins others in finding this factor weighs against a taking, as alleged by restaurants challenging COVID-related restrictions.  *See, e.g.*, *Everest Foods*, 2022 WL 355553 at *12 (finding COIVD-era restrictions on New York restaurants "were purely negative and involved no physical invasion or appropriation of Plaintiffs' property"; thus the third *Penn Central* factor weighs against a taking); *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 839 (W.D. Tenn. 2020) ("The character of Defendants' actions and the context in which Defendants find themselves, here facing a national public health emergency, cut strongly against a finding that the COVID-19 Closure Orders amount to regulatory takings."); *see also Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887) ("A prohibition simply upon the use of property for purposes that are declared . . . to be injurious to the health [ ] or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit.").

Plaintiffs make no specific allegations or arguments addressing the second *Penn Central* factor.   They argue only that the restrictions they challenge have "resulted in significant uncompensated harm to [their] distinct, investment-backed expectations in their businesses." Opp'n at 26.  But as another district court analyzing analogous regulations observed: "Although Plaintiffs understandably expected to conduct business as usual when 2020 began, the pandemic forced everyone to adjust their expectations.  Plaintiffs cannot plausibly contend that they expected to continue operating normally when doing so posed an obvious risk of spreading a contagious and dangerous virus."  *Skatemore, Inc. v. Whitmer*, No. 21-66, 2021 WL 3930808, at *4 (W.D. Mich. Sept. 2, 2021), *aff'd*, 40 F.4th 727 (6th Cir. 2022); *accord Everest Foods*,, 2022 WL 355553 at *11 ("Given that Plaintiffs, as dining establishment operators, are ordinarily subject to a panoply of health-related regulations, . . . I find it implausible that the institution of new regulations would come as a surprise, or that such changes would so substantially interfere with any expectations they may have had, as to require compensation.  This is especially so, given

1    that Plaintiffs were permitted to continue operating."); *see also Keystone Bituminous Coal Ass'n*

2    *v. DeBenedictis*, 480 U.S. 470, 491 (1987) ("[A]ll property in this country is held under the

3    implied obligation that the owner's use of it shall not be injurious to the community, and the

4    Takings Clause did not transform that principle to one that requires compensation whenever the

5    State asserts its power to enforce it." (citations omitted)).

6          Given that application of the second and third *Penn Central* factors does not support

7    plaintiffs' regulatory taking claim, the court need not reach the first factor.  *Cf. Killgore v. City of*

8    *S. El Monte*, 860 F. App'x 521, 523 (9th Cir. 2021) (unpublished) ("The first and third factors

9    defeat [plaintiff's] regulatory takings claim.").

10         The County's orders did not effect a regulatory taking.  In so finding, the court is in good

11    company.  *See, e.g.*, *Tatoma, Inc. v. Newsom*, No. 21-98, 2022 WL 686965, at *5 (S.D. Cal.

12    2022) ("Every federal court in California has held that COVID-19 health orders restricting

13    businesses are not total or regulatory takings." (footnotes omitted)); *Skatemore, Inc. v. Whitmer*,

14    40 F.4th 727, 739 (6th Cir. 2022) (noting "overwhelming majority of caselaw indicates that

15    [pandemic-era regulations limiting the use of individuals' commercial properties] are not

16    takings"; citing twenty-six cases).

17         The court **grants** defendants' motion in this respect.  Because leave to amend would be

18    futile, the court **dismisses without leave to amend** plaintiffs' physical and regulatory taking

19    claims.

20                **5.**       **Commerce Clause**

21         Plaintiffs allege the challenged orders so marginally promote public health and safety and

22    so substantially interfere with commerce as to be invalid under the so-called dormant Commerce

23    Clause.  *See* Compl. ¶¶ 146–55; Opp'n at 27.  In other words, plaintiffs invoke a tier-two dormant

24    Commerce Clause challenge to the disputed orders.  Unlike tier-one challenges, where courts

25    generally strike down statutes that directly regulate or discriminate against interstate commerce,

26    or whose effect is to favor in-state economic interests over out-of-state interests, tier-two

27    challenges succeed "only if the burdens of the statute so outweigh the putative benefits as to make

28    the statute unreasonable or irrational."  *See Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d

1136, 1145 (9th Cir. 2015) (internal quotation marks and citation omitted)).  Plaintiffs submit

their dormant Commerce Clause claim survives because unspecified allegations in the complaint,

if proven, "would establish that the Orders and restrictions at issue are far more restrictive than

necessary to achieve the goals justifying their implementation and are arbitrary by reason of

utterly failing to account for the substantial, long-term negative health effects they create."

Opp'n at 27.  Federal district courts within this circuit have consistently rejected similar

arguments.  *See Abshire v. Newsom*, No. 21-198, 2021 WL 3418678, at *8 (E.D. Cal. Aug. 5,

2021); *Pine Valley House Resort*, 2022 WL 747729; *Oregon Rest. & Lodging Ass'n v. Brown*,

No. 20-02017, 2020 WL 6905319 (D. Or. Nov. 24, 2020); *Hopkins Hawley LLC v. Cuomo*, 518

F. Supp. 3d 705 (S.D.N.Y. 2021).  This claim is **dismissed without leave to amend**.

### 6. First Amendment Retaliation

Plaintiffs allege the "County Defendants have retaliated against plaintiffs for the exercise

of their rights to free speech, lawful assembly and to petition the government for a redress of

grievances by refusing to negotiate reductions in fines imposed on Friar Tuck's, Old Town Café

and Coalition members unless plaintiffs cease these protected activities."  Compl. ¶ 158.

Defendants make three arguments in support of dismissal of this claim.  First, they contend Irani

and Elliott should be dismissed in their personal capacities because plaintiffs do not allege they

participated in the unlawful conduct in their personal capacities.  *See* Cnty.'s Mot. at 26.  Second,

they contend plaintiffs have not stated a claim for retaliation under the First Amendment.  *See id.*

at 24–25.  Third, they argue qualified immunity protects both named County officials from suit in

their personal capacities.  *See id.* at 25–28.  Defendants also argue the court should dismiss

plaintiffs' request for punitive damages and substitute Nevada County in place of all official

capacity defendants.  *See id.* at 28.  The court addresses defendants' arguments for dismissal

before addressing defendants' latter two requests.

#### a) Lack of Personal-Capacity Allegations

Defendants first contend the claims against Irani and Elliot should be dismissed because

plaintiffs do not allege they participated in the unlawful conduct in their personal capacities.  *See*

*id.* at 26 (arguing for dismissal because the alleged statements "are not the type of off-work

1   comments or actions by public officials that can trigger personal liability"); *id.* at 27 ("Nowhere

2   in the Complaint do Plaintiffs refer to anything Irani or Elliott did off-duty or even slightly

3   beyond the formal discharge of their official duties."). This argument fails to acknowledge

4   binding Supreme Court authority. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) (rejecting argument

5   that "state officials may not be held liable in their personal capacity [under § 1983] for actions

6   they take in their official capacity").

7                                    b)       Failure to State a Claim

8           "To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged

9   in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary

10  firmness' from continuing to engage in the protected activity; and (3) the protected activity was a

11  substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the

12  defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,

13  824 F.3d 858, 867 (9th Cir. 2016) (quoting *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016)).

14  "The prototypical plaintiff in these cases is . . . a regulated entity that is stripped of its business

15  license after engaging in speech that displeases the regulator . . . ." *Blair v. Bethel Sch. Dist.*, 608

16  F.3d 540, 544 (9th Cir. 2010) (citing *CarePartners, LLC v. Lashway*, 545 F.3d 867, 871 (9th Cir.

17  2008)).

18          Here, plaintiffs state a claim for First Amendment retaliation against Elliott under this

19  standard by alleging four facts: (1) plaintiffs formed the coalition, Compl. ¶ 72; (2) plaintiffs

20  "asked patrons, family, and friends to write to the County Defendants to express opposition to the

21  shutdown of local restaurants," *id.* ¶ 71; (3) Elliott demanded plaintiffs "stop asking people" to do

22  so as a condition of reinstituting their operating permits and reducing their fines, *id.* ¶ 74; and

23  (4) Elliott stated "plaintiffs' establishment of the Coalition would be considered as grounds to

24  refuse to negotiate a lowering of the fines imposed upon Friar Tuck's, Old Town Café and

25  members of the Coalition," *id.* ¶ 75.

26          Plaintiffs do not, however, allege any participation by Irani. To be held liable under

27  § 1983, defendants must be "integral participants in the unlawful conduct." *Keates v. Koile*, 883

28  F.3d 1228, 1241 (9th Cir. 2018). "Because the complaint does not offer any plausible allegation

                                                    22

1  that [Irani] participated in the decision to interfere with [plaintiffs'] constitutional rights," *id.* at

2  1242, dismissal is appropriate, *see Boyd v. Benton Cnty.,* 374 F.3d 773, 780 (9th Cir. 2004)

3  (Liability cannot attach to "a mere bystander who had no role in the unlawful conduct." (internal

4  quotation marks and citation omitted)).  Plaintiffs' First Amendment retaliation claim against

5  Irani in her personal capacity is **dismissed with leave to amend**.

6                  c)      Qualified Immunity

7        To defeat an invocation of qualified immunity in response to a motion to dismiss, a

8  plaintiff must allege (1) "a violation of a constitutional right" that was (2) "clearly established at

9  the time of [the] defendant's alleged misconduct."  *Pearson,* 555 U.S. at 232 (internal quotation

10  marks omitted).  As discussed above, plaintiffs have sufficiently alleged a violation of their First

11  Amendment rights against defendant Elliott.  Thus, if the constitutional right at issue was "clearly

12  established" when Elliott allegedly violated it, defendants are not entitled to dismissal of this

13  claim.

14        To be clearly established,

15          the contours of the right must be sufficiently clear that a reasonable
16          official would understand that what he is doing violates that right.
17          While there need not be a case directly on point, existing precedent
18          must have placed the statutory or constitutional question beyond
19          debate. . . .

20          To determine if a right was clearly established, the relevant inquiry
21          is whether, at the time of the officers' action, the state of the law gave
22          the officers fair warning that their conduct was unconstitutional.

23  *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022) (internal citations, quotation marks, and

24  alternations omitted).  As relevant here, and years before Elliot met with plaintiffs as alleged in

25  the complaint, the Ninth Circuit clarified the applicable First Amendment law:

26          A state, division of the state, or state official may not retaliate against
27          a person by depriving him of a valuable government benefit that that
28          person previously enjoyed, conditioning receipt of a government
29          benefit on a promise to limit speech, or refusing to grant a benefit on

30  /////

23

1
2
3

the basis of speech. Those limitations apply even if the aggrieved party has no independent or affirmative right to that government benefit[.]

4   *Arizona Students' Ass'n*, 824 F.3d at 869.  The constitutional question was thus settled and the

5   answer "beyond debate."  Nevada County Counsel Elliot had "fair warning" that it was

6   unconstitutional both to (1) explicitly condition reinstitution of operating permits and fine

7   reductions on plaintiffs' stopping their requests that people petition local officials, *see* Compl.

8   ¶ 74, and (2) refuse to lower fines explicitly because plaintiffs formed the coalition, *see id.* ¶ 75.

9   Accepting plaintiffs' allegations as true, as the court must do at this stage, Elliot is not entitled to

10  qualified immunity.  *See also CarePartners, LLC v. Lashway*, 545 F.3d 867, 883 (9th Cir. 2008)

11  (discussing case "involv[ing] a regulated entity claiming intentional retaliation by government

12  officials because of the exercise of speech and petition rights" and finding such "speech and

13  petition rights . . . have been clearly established in this circuit since 1989" (referencing *Soranno's*

14  *Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989))).

15                         d)       Punitive Damages

16      County Defendants submit plaintiffs' requests for "punitive damages are subject to

17  dismissal as a matter of law as there are no factual allegations showing that the actions of Irani or

18  Elliott were so outrageous or shocking to the conscience as to justify punitive damages."  Cnty.'s

19  Mot. at 28–29.  Plaintiffs do not formally oppose this aspect of defendants' motion.  The court

20  thus **dismisses** plaintiffs' request for punitive damages.  *See Montgomery v. Specialized Loan*

21  *Servicing, LLC*, 772 F. App'x 476, 477 (9th Cir. 2019) (unpublished) ("The district court properly

22  dismissed plaintiffs' remaining claims because plaintiffs failed to respond to the arguments raised

23  in defendants' motion to dismiss these claims." (citing *Walsh v. Nev. Dep't of Human Res.*, 471

24  F.3d 1033, 1037 (9th Cir. 2006))); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 842

25  (N.D. Cal. 2020) ("Based on Plaintiffs' lack of response [to defendants' motion to dismiss], the

26  Court considers the claim . . . abandoned and the argument conceded." (citation omitted)).

1                  e)      Substitution

2        County Defendants argue "if this Court does not dismiss this action without leave to

3 amend, it should dismiss all the individually named County officials . . . in their official capacities

4 and substitute Nevada County as the correct party in their place." Cnty.'s Mot. at 28. District

5 courts in the Ninth Circuit are split regarding whether to substitute defendants in this situation.

6 *Compare, e.g.*, *Luke v. Abbott*, 954 F. Supp. 202, 203 (C.D. Cal. 1997) ("A plaintiff cannot elect

7 which of the defendant formats to use. . . . If only the official-capacity officer is named, it would

8 be proper for the Court upon request to dismiss the officer and substitute instead the local

9 government entity as the correct defendant."), *with, e.g.*, *Berry v. Baca*, No. 01-2069, 2002 WL

10 356764, at *2 (C.D. Cal. Feb. 26, 2002) (declining to follow *Luke* because it is "axiomatic" that

11 the plaintiff is the master of his complaint and controls who is named as a defendant). However,

12 plaintiffs do not oppose defendants' substitution request, so it is **granted**. *Cf. In re Google*

13 *Assistant Priv. Litig.*, 457 F. Supp. 3d at 842.

14 **IV.   CONCLUSION**

15        For the reasons explained above, plaintiffs' claims against the State Defendants are moot,

16 and the State Defendants' motion to dismiss is thus **granted** in full. The Clerk of Court is

17 **directed** to dismiss all State Defendants from this case.

18        The County Defendants' motion to dismiss is **granted in part and denied in part**.

19 Specifically, plaintiffs' equal protection claim is **dismissed with leave to amend**. Plaintiffs' First

20 Amendment retaliation claim against Irani in her personal capacity is also **dismissed with leave**

21 **to amend**. Plaintiffs' substantive due process, procedural due process, physical and regulatory

22 takings, and commerce clause claims are **dismissed without leave to amend**. Plaintiffs' request

23 for punitive damages is **waived** and therefore **dismissed**. County Defendants' motion to dismiss

24 plaintiffs' First Amendment retaliation claim against Elliot in her personal capacity is **denied**.

25 The Clerk of Court is **directed** to dismiss from this lawsuit all County Defendants sued in their

26 official capacity and substitute Nevada County in their place.

27        Plaintiffs may file an amended complaint within twenty-one days of this order. A status

28 (pretrial scheduling) conference is set for **November 17, 2022 at 2:30 p.m.** The status

1   conference will proceed by videoconferencing through the Zoom application. The Courtroom

2   Deputy will provide counsel with the hearing access information no later than one day before the

3   conference. The parties shall file a joint status report **no later than fourteen days** prior to the

4   conference.

5        This order resolves ECF Nos. 9, 10, 11, 12 & 35.

6        IT IS SO ORDERED.

7   DATED:  October 2, 2022.

CHIEF UNITED STATES DISTRICT JUDGE

26